# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,       )
                                )
                                )
         v.                  )     I.D. No. 1312003447B
                                )
RODERICK OWENS,       )
                                )
      Defendant.        )

Submitted:  September 30, 2021
Decided: December 21, 2021

*Upon Consideration of Defendant's Motion for Post-Conviction Relief*,
**DENIED.**

## MEMORANDUM OPINION

Jenna R. Milecki, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware. *Attorney for the State of Delaware.*

Brian J. Chapman, Esquire, LAW OFFICE OF BRIAN J. CHAPMAN, Newark, Delaware. *Attorney for Defendant Roderick Owens.*

**BUTLER, R.J.**

Defendant Roderick Owens was convicted on felony weapons charges and then sentenced as a habitual offender. He now seeks post-conviction relief, claiming his lawyer ("Trial Counsel") represented him ineffectively. The Court finds that his allegations are not supported by the record, which demonstrates that Trial Counsel performed reasonably under difficult circumstances. Accordingly, Mr. Owens's Criminal Rule 61 motion will be denied.

## BACKGROUND[1]

### A. The Direct Proceedings

#### 1. The Arrest and Charges.

Eight years ago, Mr. Owens was seated on the steps of a boarded-up house emblazoned with a "No Loitering" sign. Some days before, the property owner, who was not living in the house, reported vagrant activity on the property. Two officers who knew about the reports and were investigating recent shootings in the neighborhood saw Mr. Owens as they drove by.

As the police car approached, Mr. Owens bladed his stance. He adjusted his waistband and grasped a rectangular object at his hip. He was staring in the officers' eyes as they parked. Then, he ran. He sprinted for blocks and through an alley as

---

[1] The Court has drawn its factual background from the appendix (hereinafter "A[x]") attached to Mr. Owens's amended Rule 61 motion as well as the larger criminal file compiled by the court over the course of Mr. Owens's direct and collateral proceedings. Where appropriate, the Court will cite to specific documents.

the original officers and additional reinforcements pursued him on foot and ordered him to stop. He kept running and ignoring the police until a taser ended the race.

With the police in hot pursuit, Mr. Owens tossed a loaded handgun onto the sidewalk. Mr. Owens is a convicted felon, making his possession of a handgun illegal. A New Castle County grand jury accordingly indicted him on charges of Possession of a Firearm by a Person Prohibited ("PFBPP"), Possession of Ammunition by a Person Prohibited ("PABPP"), Carrying a Concealed Deadly Weapon ("CCDW") and Resisting Arrest.

**2. The Defense.**

Mr. Owens's case was assigned to Trial Counsel, who successfully moved to sever the person prohibited charges (the "A case") from the CCDW and Resisting Arrest charges (the "B case"). Trial Counsel then moved to suppress the firearm— an essential ingredient of both cases.

**a. The Suppression Motion.**

The defense moved to suppress the gun as the fruit of an illegal seizure. But the reports of loitering at the property and Mr. Owens's furtive movements upon seeing the police created a reasonable suspicion that he may be concealing a weapon. A superficial *Terry* frisk would have revealed the gun. Tossing the gun brought into

play other issues concerning abandonment of the property and standing to challenge its seizure.[2]

At the suppression hearing, Trial Counsel first tried suggesting that the officer's account had been fabricated. When that effort fizzled, he attempted to argue (i) Mr. Owens was "seized" without probable cause from the moment the police arrived—*i.e.*, even before they suspected Mr. Owens of possessing a gun—because their uniforms displayed a "show of authority;" and (ii) even if the police had reasonable suspicion to believe Mr. Owens had been loitering, it was dispelled, and the encounter should have been over, when Mr. Owens ran away.

After hearing the evidence, the suppression court denied the motion. The court did not base its ruling exclusively on the condition of the residence or the loitering accusations. Instead, the court held that, in the totality of the circumstances, the officers had reasonable suspicion to believe Mr. Owens possessed a gun and did not seize him until he defied the officers' commands that he stop:

> [T]his Court finds that Defendant was not seized until [the officer] ordered him to stop . . . . [The officer] had reasonable articulable suspicion to stop Defendant. Defendant was sitting at a vacant home with boarded windows bearing a "No Loitering" sign. [The officer] was aware that the owner had reported people had been loitering at the home. The home was in a high crime area where [the officer] had received a call of gunshots just a few days prior to the incident. Before [the officer] could approach Defendant, Defendant stood up and adjusted his waistband and fled while grasping a rectangular object at his waistband. [The officer] was familiar with these types of

---

[2] *See, e.g.*, *Jackson v. State*, 990 A.2d 1281, 1288–89 (Del. 2009); *cf. Jones v. State*, 28 A.2d 856, 861–64 (Del. 1999).

4

movements as being movements of an armed individual. *Based on the totality of these circumstances*, [the officer] had reasonable articulable suspicion to seize the Defendant.[3]

The suppression court's written decision does not leave the impression that the ruling would have changed had Trial Counsel done something different.

### b. The Pre-Trial Plea Negotiations.

Mr. Owens had other legal difficulties beyond a weak suppression case. He previously had been convicted of three separate felonies, including two "violent" ones.[4] PFBPP is itself defined as a "violent felony."[5] As a consequence, a conviction on PFBPP would expose Mr. Owens to two different, both lengthy sentencing regimes.

First, by operation of 11 *Del. C.* § 1448(e)(1)(c) and his two prior "violent" felony convictions, the PFBPP conviction would subject him to a mandatory sentence of 10 years.[6] Second, those same prior felony convictions (plus an additional one) qualified Mr. Owens for habitual offender sentencing under 11 *Del.*

---

[3] A44–45 (Suppression Op.) (emphasis added).

[4] One of the prior "violent felonies" Mr. Owens had committed was a drug-possession-within-300-feet-offense that no longer was considered a violent felony at the time of Mr. Owen's person prohibited convictions. *See generally Butcher v. State*, 171 A.3d 537, 540 (Del. 2017) (noting 2011 repeal). This may have mattered for person prohibited enhancements, depending on the state of the law in 2014, but was irrelevant to the habitual enhancements applied here. Because Mr. Owens was convicted of three prior felonies of any kind, the PFBPP conviction triggered the penalty range applicable to his A case sentences. *See* 11 *Del. C.* § 4214(a) (2012).

[5] *See* 11 *Del. C.* § 4201(c) (2020).

[6] *See* 11 *Del. C.* § 1448(e)(1)(c), (3).

*C.* § 4214. Upon the State's motion, a habitual sentence would draw Mr. Owens anywhere from 15 years (the habitual minimum mandatory for Class C felonies) to life (the habitual maximum for any fourth felony conviction).[7] These options gave the State enormous leverage and conversely confined Trial Counsel to convincing the prosecutor either to knock the charges down or offer a non-habitual 10 years. Worse, even an acquittal at trial in the A case would not automatically clear Mr. Owens's exposure in the B case, which also qualified for habitual offender sentencing.

The State made an early offer to resolve both cases with a recommendation of 15 years at Level V. Mr. Owens declined, opting instead to file the ill-fated suppression motion. Even after its filing, the State lowered its offer to 10 years conditioned on Mr. Owens withdrawing the motion. We know that did not happen: Mr. Owens repudiated the offer and proceeded to suppression. While awaiting the suppression ruling, the A case had its final case review, where the following dialogue occurred:

> **TRIAL COUNSEL**: Mr. Owens, who[se] also incarcerated, will be set for trial . . . pending [a] suppression issue . . . .
>
> **THE COURT**: What has Mr. Owens been offered?

---

[7] *See* 11 *Del. C.* § 4214(a) (2012). The 2016 revisions to the habitual offender statute, which are effective today, would have exposed Mr. Owens to the same penalty range. *See* 11 *Del. C.* § 4214(c) (2020).

6

**TRIAL COUNSEL**: The minimum mandatory. Right now, the last offer was . . . ten years . . . . I have . . . had discussions with [the State], but there has been nothing better than that, which [was] the offer prior to the suppression hearing . . . .

**THE COURT**: I'll need to have a copy of that plea offer.

**TRIAL COUNSEL**: I actually do not know if I have a copy of the latest offer. I understand [the prosecutor] is not here currently either . . . .

**THE COURT**: Based on your representation, I don't think I need to speak with Mr. Owens. I can understand why the plea is being rejected at this time.[8]

As the Court understood, there would have been no reason to discuss pleas or colloquy old offers while the gun's suppression was still a (slim) possibility and a 10-year mandatory hung in the balance.

### c. The Post-Trial Plea Negotiations.

When Mr. Owens elected to proceed with suppression, the State rescinded its 10-year offer in favor of seeking both a guilty verdict and habitual sentencing.[9] Faced with the same facts at trial as it had at suppression, the defense renewed its attacks on the officer's credibility. Trial Counsel attempted to extract inconsistencies from the officer's incident report to demonstrate the police wrongly arrested Mr. Owens. Ultimately, the jury was not persuaded. It convicted him on both charges in the A case.

---

[8] A152–53 (Final Case Rev. Hr'g Tr.).
[9] *See* A147 (E-mail from David Holloway, Deputy Att'y Gen., Del. Dep't of J., to Ross Flockerzie, Assistant Pub. Def., Off. of Def. Servs. (Sept. 9, 2014)) ("[Mr. Owens] is Habit A, which means he's facing 15-life if convicted.").

In light of those convictions, and the State's right to declare Mr. Owens a habitual offender, Trial Counsel pushed for a *nolle prosequi* disposition of the B case. The State refused, offering instead to drop the Resisting Arrest charge in exchange for a non-habitual CCDW guilty plea.[10] Trial Counsel observed his duty to relay this offer to Mr. Owens, but opined that Mr. Owens likely would reject it:

> Mr. Owens is facing 15 to life . . . . If the offer is that he can plead to CCDW with open sentencing and the State will drop a misdemeanor resisting charge, then there's not any incentive to resolve it. It makes sense to [*nol. pros.*] these charges. [The State] is getting a minimum of 15 years . . . .

> I will certainly convey the offer to my client as I am required to do. I'm not inclined[,] however, to believe that my client will want to accept it.[11]

Trial Counsel's prediction was accurate. As of the A case's sentencing, the parties still planned to try the B case.[12]

### d. The Sentencing.

The State petitioned to declare Mr. Owens a habitual offender. Given Mr. Owens's predicate felonies, Trial Counsel had no good faith basis to oppose the petition. The sentencing court granted the motion and the State asked the court to impose 20 years. Trial Counsel countered with 15 years, the minimum available under the habitual offender statute, emphasizing the harmlessness of possessing a

---

[10] *See* A142 (E-mail from David Holloway, Deputy Att'y Gen., Del. Dep't of J., to Ross Flockerzie, Assistant Pub. Def., Off. of Def. Servs. (Dec. 2, 2014)).

[11] *Id.* (E-mail from Ross Flockerzie, Assistant Pub. Def., Off. of Def. Servs., to David Holloway, Deputy Att'y Gen., Del. Dep't of J. (Dec. 4, 2014))

[12] A76 (Sentencing Hr'g Tr. at 9:17–22).

gun *vis-à-vis* using it and the inequity of giving Mr. Owens generations of time despite not hurting anyone. Trial Counsel also explained that Mr. Owens would not make a statement not because he lacked remorse, but rather, because the B case was still pending and Mr. Owens could jeopardize his defenses or an appeal by commenting on his guilt.[13] At the end of Trial Counsel's presentation, the court asked: "Anything else?"[14] The defense said no.[15]

The court sentenced Mr. Owens to 19 years at Level V. The sentence comprised: (i) a mandatory 15 years at Level V; and (ii) a discretionary 8 years at Level V suspended after 4 years for decaying levels of probation.[16] The court, however, retained jurisdiction to modify or eliminate the discretionary tail of the sentence "after several years ha[d] passed."[17] Additionally, after Mr. Owens told the court he graduated from high school,[18] the court tailored its order to allow for his early release from probation if he submitted proof of obtaining some college credit.[19]

Having imposed the 15-year minimum mandatory, the court had discretion to stop there. Its decision to impose an additional four years anyway appears to have

---

[13] *See id.* (Sentencing Hr'g Tr. at 11:13–20).
[14] *Id.* (Sentencing Hr'g Tr. at 12:9).
[15] *Id.* (Sentencing Hr'g Tr. at 12:10).
[16] A79–80 (Sentencing Or.).
[17] A81 (Sentencing Or.)
[18] A77 (Sentencing Hr'g Tr. at 15:21–23, 16:1–2).
[19] A81 (Sentencing Or.).

been based predominantly on the fact that the gun was concealed[20] and a PSI report spanning 35 pages of charging history chronicling multiple crimes and probation violations and which identified juvenile offenses Mr. Owens started committing at 11 years old. Indeed, much of Mr. Owens's record reflected conduct of the very type for which he had been indicted and convicted here. Despite those aggravating factors, the court believed its sentence for the A case was globally sufficient and so encouraged the parties to resolve the B case "reasonably."[21] Heeding that suggestion, the State eventually dropped the B case.

### e. The Appeal.

Mr. Owens appealed to the Delaware Supreme Court. The sole issue he presented on direct appeal was whether the police had reasonable suspicion to question his presence at the home.[22] On March 4, 2016, the Supreme Court summarily affirmed Mr. Owens's convictions and sentence.[23]

## B. This Motion

On February 27, 2017, Mr. Owens filed a *pro se* Criminal Rule 61 motion for post-conviction relief. On March 7, 2017, the Court granted Mr. Owens's request for appointment of counsel. Due to procedural and administrative misadventures,

---

[20] A81 (Sentencing Or.).
[21] A77 (Sentencing Hr'g Tr. at 15:2–6).
[22] A92–96 (App. Br.).
[23] *See generally Owens v. State*, 2016 WL 859351 (Del. Mar. 4, 2016). The Supreme Court's mandate was issued on March 17, 2016. *See* A98.

including motions to withdraw, judicial reassignments, the COVID-19 pandemic, and Mr. Owens's repeated deliveries of new claims via *pro se* letters, the instant (amended) motion was not submitted by Mr. Owens's current counsel until September 1, 2021. The State opposes the motion and it is now ripe for decision.

## C. The Claims for Relief.

Mr. Owens brings one claim—ineffective assistance of Trial Counsel—but divides it into a number of categories.[24] Trial Counsel has filed an affidavit in which he denies the allegations. For clarity, the Court has summarized Mr. Owens's allegations and Trial Counsel's responses by subject matter below.

### 1. The Plea Claim.

Mr. Owens alleges Trial Counsel was ineffective because Trial Counsel did not communicate any of the State's plea offers to him.

Trial Counsel denies this. He states that he communicated the first (15-year) plea offer to Mr. Owens after the first case review as the defense met and conferred on whether to file a suppression motion.[25] He also states that he communicated the second (10-year) plea offer to Mr. Owens at a meeting between the two that occurred

---

[24] Mr. Owens's post-conviction counsel has represented that, after reviewing all Mr. Owens's *pro se* claims, the only non-frivolous ones have been argued in this motion. So the Court will not consider any claims Mr. Owens advanced on his own. *See, e.g.*, Del. Super. Ct. Crim. R. 47; *Pringle v. State*, 2013 WL 1087633, at *4 (Del. Mar. 13, 2013).

[25] A133 (Flockerzie Aff.).

11

before the suppression hearing.[26]  As support for these statements, Trial Counsel cites meeting dates, his written plea negotiations with the State, his representations to the Court at final case review, and his ethical obligation to notify his clients of plea offers.  Given the case's serious sentencing consequences, Trial Counsel insists that his duty to communicate plea offers was discharged:

> I cannot think of a circumstance where I have ever not met with a client [like Mr. Owens] at case review where the client was present . . . . There is simply no way that I would have failed to convey a plea offer to [him] . . . .  I cannot envision any scenario where I would have made [a] representation to the Court [that Mr. Owens rejected a plea] and not informed my client of the offer . . . . [Based on the plea negotiation messages to the State,] I understood clearly that I ha[d] a professional obligation to convey plea offers to [him].[27]

## 2.  The Suppression Claims.

Mr. Owens alleges Trial Counsel was ineffective because he failed to investigate three witnesses who, according to Mr. Owens, would have testified that the residence was not abandoned at the time of his arrest.  Relatedly, Mr. Owens alleges Trial Counsel's failure to call these witnesses allowed the officer's "false" testimony to go unrebutted.

Trial Counsel states that he did not call the three witnesses because he did not think their proffered testimony about the condition of the residence would be relevant to the question of whether the police seized Mr. Owens lawfully.[28]  That

---

[26] A134, 136–38 (Flockerzie Aff.).
[27] A134, 138 (Flockerzie Aff.).
[28] A135 (Flockerzie Aff.).

aside, he states that he did investigate, and receive a letter from, the property owner. The owner told Trial Counsel that she "never reside[s] at the property" and did not call the police on Mr. Owens.[29]

### 3. The Critical Stage Claim.

Mr. Owens alleges Trial Counsel was ineffective because he failed to produce him for final case review on the A case, which he says is a critical stage in the proceedings and during which he had a right to be present in the courtroom. The Court will discuss this Claim in more detail below.

### 4. The Allocution Claim.

Mr. Owens alleges Trial Counsel was ineffective because Mr. Owens was denied an opportunity to allocute during sentencing. We will discuss the allocution argument below.

### 5. The Neglect Claims.

Mr. Owens alleges Trial Counsel was ineffective because Trial Counsel did not meet with him in any meaningful way. Mr. Owens says Trial Counsel's neglect resulted in him feeling unprepared and uninformed and in a lacking mitigation at sentencing.

---

[29] A145 (Letter from Augusta Collier, Prop. Owner, to Ross Flockerzie, Assistant Pub. Def., Off. of Def. Servs. (July 22, 2016)).

Trial Counsel states that he met with Mr. Owens at least four times before trial: (i) by video shortly after his arraignment; (ii) on the day of first case review; (iii) before the suppression hearing; and (iv) on the day of final case review.[30] Each time, Trial Counsel emphasizes, he discussed the State's arguments, the evidence against Mr. Owens, the plea offers (where applicable), the viability of the suppression motion (where applicable), and trial.[31]

### 6. The Cumulative Error Claim.

Finally, Mr. Owens argues, even if each of Trial Counsel's errors is not by itself prejudicial, their cumulative impact shows the direct proceedings were unfair. This argument will be discussed in more detail below.

### STANDARD OF REVIEW

A defendant may move for post-conviction relief under Criminal Rule 61.[32] Rule 61 ensures conviction integrity.[33] It provides a "collateral remedy" capable of overturning "judgments that *otherwise* have become final."[34] In other words, Rule 61 "balances" the law's interest in conviction finality "against . . . the important role of the courts in preventing injustice."[35] Although the presence of collateral review

---

[30] A135–37 (Flockerzie Aff.).
[31] *Id.*
[32] Del. Super. Ct. Crim. R. 61.
[33] *See, e.g., Ploof v. State*, 75 A.3d 811, 820 (Del. 2013) ("Rule 61 is intended to correct errors in the trial process . . . .").
[34] *Flamer v. State*, 585 A.2d 736, 745 (Del. 1990) (emphasis added).
[35] *Zebroski v. State*, 12 A.3d 1115, 1120 (Del. 2010).

reintroduces uncertainty into completed criminal proceedings, the marginal inconvenience to valid convictions is outweighed by the possibility that "extraordinary case[s]" of innocence or egregious error would otherwise go unrelieved.[36]

Judgments are presumed valid.[37] Rule 61 reflects that principle. Post-conviction review starts from the premise that the challenged conviction is supported by a "sufficient factual and legal basis."[38] Most are.[39] So Rule 61 shifts to the defendant the burden of demonstrating otherwise.[40]

In attacking a conviction, defendants must contend with a "presumption of regularity."[41] "The presumption of regularity attaches to all final judgments . . . and implies those judgments have been done rightly until contrary evidence appears."[42] Contrary but conclusory, contradicted, or unclear allegations are not entitled to truth:

---

[36] *Purnell v. State*, 254 A.3d 1053, 1123 (Del. 2021) (internal quotation marks omitted).

[37] Restatement (First) of Judgments § 4 (1952); *see also id.* § 11 ("Where in a subsequent judicial proceeding . . . [a] party *sets up the invalidity* of the judgment, he is collaterally attacking the judgment." (emphasis added)).

[38] Del. Super. Ct. Crim. R. 61(a)(1).

[39] *See Purnell*, 254 A.3d at 1122–23 ("We observe that legitimate claims of actual innocence are exceedingly rare . . . . Because they are so rare, [they] pose[] no threat to our State's interest in finality.").

[40] Del. Super. Ct. Crim. R. 61(a)(1); *see, e.g.*, *Dorsey v. State*, 2007 WL 4965637, at *1–2 (Del. Nov. 6, 2007).

[41] *Parke v. Raley*, 506 U.S. 20, 29 (1992); *accord Xenidis v. State*, 2020 WL 1274624, at *2 (Del. Mar. 17, 2020).

[42] *Xenidis*, 2020 WL 1274624, at *2.

On collateral attack, a silent record supports the judgment; the state receives the presumption of regularity and all reasonable inferences . . . . [G]aps and ambiguities in the record [do not] count against the state. Judgments are presumed valid . . . and one who seeks collateral relief bears a heavy burden.[43]

A post-conviction record is archival and so the Court is limited to making "historical" fact determinations.[44] Reviewing from that lens, the Court evaluates the credibility of the defendant's instant allegations by comparing them to the original record.[45] If, based on the record and the inferences drawn therefrom, the defendant's claims lack "colorable merit," then the motion will be "summarily dismissed."[46]

## ANALYSIS

A Rule 61 analysis proceeds in two steps. First, the Court must determine whether the motion clears Rule 61's procedural bars.[47] If so, the Court next reviews

---

[43] *Higgason v. Clark*, 984 F.3d 203, 208 (7th Cir. 1993) (citations omitted); *accord Meyers v. Gillis*, 93 F.3d 1147, 1151 (3d Cir. 1996); *Benjamin v. McGinley*, 2019 WL 952142, at *10 (W.D. Pa. Feb. 27, 2019).
[44] *Burrell v. State*, 953 A.2d 957, 960 (Del. 2008).
[45] *See Swan v. State*, 28 A.3d 362, 387 (Del. 2011) (observing that post-conviction courts may make credibility determinations and according "deference" to finding that post-conviction defendant's version of events was "not credible" in light of the record), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016).
[46] *Baldwin v. State*, 166 A.3d 938, 939 (Del. 2017) (citing Del. Super. Ct. Crim. R. 61(d)(5)).
[47] *E.g.*, *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

16

the motion's merits on a claim-by-claim basis.[48]  As explained below, Mr. Owens's

motion is not barred, but it fails to state a claim for post-conviction relief.[49]

## A. Mr. Owens's Motion Is Not Procedurally Barred.

Rule 61 is nothing "other than a procedural device."[50]  By consequence,

"[t]here are several limitations on . . . postconviction relief."[51]  A Rule 61 motion

must be dismissed if it is untimely or successive or raises claims that have been

defaulted or are precluded by a prior adjudication.[52]  None of these bars applies here.

Mr. Owens's motion is not time-barred because it was filed within one year

of his convictions' finality.[53]  It is not number-barred because it is Mr. Owens's first

---

[48] *E.g.*, *State v. Reyes*, 155 A.3d 331, 342 n.15 (Del. 2017).

[49] As explained more completely *infra* Analysis.C, the Court also denies Mr. Owens request for an evidentiary hearing because nothing Mr. Owens seeks to present would change the outcome.  *See* Del. Super. Ct. Crim. R. 61(h)(1), (3).

[50] *Bailey v. State*, 588 A.2d 1121, 1125 (Del. 1991).

[51] *Ploof*, 75 A.3d at 820.

[52] Del. Super. Ct. Crim. R. 61(i)(1)–(4); *see, e.g.*, *State v. Wright*, 67 A.3d 319, 323 (Del. 2013).  Mr. Owens filed his initial motion on February 27, 2017—about one month before the 2017 iteration of Rule 61 took effect—making the June 1, 2015, Rule 61 applicable here.  *See, e.g.*, *Redden v. State*, 150 A.3d 768, 772 (Del. 2016). The Court notes, however, that none of the provisions implicated in this motion was amended in 2017 and so the analysis would be the same under either the 2015 or 2017 version. *See Order Amending Rule 61 of the Superior Court Rules of Criminal Procedure*, Del. Super. Ct. (Mar. 23, 2017), courts.delaware.gov/forms/download.aspx?id=93658; *Order Amending Rule 61(e) of the Superior Court Rules of Criminal Procedure*, Del. Super. Ct. (May 29, 2015), courts.delaware.gov/superior/pdf/criminal_rule_61_amend_e_5_6_2015.pdf.

[53] Del. Super. Ct. Crim. R. 61(i)(1), (m)(2).

one.[54]  And it is neither defaulted nor precluded[55] because it raises ineffective assistance claims and such claims could not have been raised or resolved at any earlier stage in this case.[56]  Accordingly, the Court may reach the motion's merits.

## B.  Mr. Owens Is Not Entitled to Post-Conviction Relief.

Defendants have a right to effective assistance of counsel.[57]  But calling a lawyer's representation ineffective does not make it so.   Carrying an ineffective assistance claim is a "heavy burden."[58]  To demonstrate ineffective assistance, a defendant must show "first, that his counsel's representation fell below an objective standard of reasonableness and, second, that the deficiencies in counsel's representation caused him substantial prejudice."[59]  Proving both deficient

---

[54] *Id.* R. 61(i)(2).
[55] *Id.* R. 61(i)(3)–(4).
[56] *See, e.g.*, *Green v. State*, 238 A.3d 160, 175 (Del. 2020) ("Simply put, ineffective-assistance claims are not subject to Rule 61(i)(3)'s bar because they cannot be asserted in the proceedings leading to the judgment of conviction under the Superior Court's rules and this Court's precedent.  Put yet another way, the failure to assert an ineffective-assistance-of-counsel claim in the proceedings leading to the judgment of conviction is not a procedural default." (footnote omitted)); *see also Duross v. State*, 494 A.2d 1265, 1269 (Del. 1985) (observing that motions for post-conviction relief afford "proper review" of ineffective assistance claims); *see generally Guy v. State*, 82 A.3d 710, 715 (Del. 2013) ("[I]n a jurisdiction like Delaware, where ineffective assistance of trial counsel may not be raised on direct appeal, the first post-conviction proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective [] assistance claim." (internal quotation marks omitted)).
[57] *E.g.*, *Reed v. State*, 258 A.3d 807, 821 (Del. 2021).
[58] *Green*, 238 A.3d at 174; *accord Swan v. State*, 248 A.3d 839, 859 (Del. 2021).
[59] *Green*, 238 A.3d at 174 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).

performance and substantial prejudice places a "formidable obstacle" in the path of securing post-conviction relief.[60] "Mere allegations of ineffectiveness will not suffice."[61] Instead, a finding of ineffective assistance must be "compelled" by the record.[62] To be ineffective, "counsel's conduct [must have] so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[63]

Allegations of deficient performance are counteracted by "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[64] "There are countless ways to provide effective assistance . . . . Even the best criminal defense attorneys would not defend a particular client in the same way."[65] As a result, an ineffective assistance claimant must establish that "no reasonable lawyer would have conducted the defense as his lawyer did."[66]

---

[60] *Id.*

[61] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[62] *Swan*, 248 A.3d at 859 (internal quotation marks omitted); *see also Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014) ("[T]he defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." (internal quotation marks omitted)).

[63] *Strickland*, 466 U.S. at 686; *accord Shockley v. State*, 565 A.2d 1373, 1376 (Del. 1989).

[64] *Green*, 238 A.3d at 174 (internal quotation marks omitted).

[65] *Strickland*, 466 U.S at 689.

[66] *Green*, 238 A.3d at 174 (internal quotation marks omitted).

Determining whether a defense attorney deviated from institutional norms requires a retrospective focus.[67] A performance analysis involves "reconstruct[ing] the circumstances of counsel's challenged conduct . . . from the counsel's perspective at the time."[68] Necessarily, then, the scope of performance review is limited to decisions made and excludes consideration of results achieved.[69] The outcomes of otherwise reasonable trial strategies and professional judgments are "virtually unchallengeable."[70]

Situated in the past, the Court "must remain cognizant that trial counsel's performance, *viewed as a whole*, is what matters."[71] Performance review looks to the entire representation and so analytically captures the defendant's conduct as well. Because defense lawyers serve clients, "a client's statements or actions may substantially influence counsel's choices."[72] Because defendants always control key

---

[67] *See, e.g.*, *Ploof*, 75 A.3d at 821 (cautioning courts not to reason from "hindsight").

[68] *Neal v. State*, 80 A.3d 935, 942 (Del. 2013) (internal quotation marks and emphasis omitted).

[69] *See, e.g.*, *id.* ("Because it is all too easy for a court examining counsel's defense after it has proved unsuccessful to succumb to the distorting effects of hindsight, counsel's *actions* are afforded a strong presumption of reasonableness." (emphasis added) (alteration and internal quotation marks omitted)); *see also Burns v. State*, 76 A.3d 780, 788 (Del. 2013) ("[E]ven evidence of isolated poor strategy, inexperience, or bad tactics does not necessarily amount to ineffective assistance of counsel." (alterations and internal quotation marks omitted)).

[70] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).

[71] *Green*, 238 A.3d at 174 (alteration and internal quotation marks omitted).

[72] *Shockley*, 565 A.2d at 1376.

aspects of their defense,[73] a defendant "cannot shift responsibility to his trial counsel for decisions in which he played a major role."[74]

Deficient performance alone will not invalidate a conviction. An ineffective assistance claimant also must show substantial prejudice: "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."[75] "A reasonable probability means a probability sufficient to undermine confidence in the outcome . . . ."[76] And "[t]he likelihood of a different result must be substantial[,] not just conceivable."[77] Failure to state prejudice with particularity is "fatal."[78] "[T]here is no need to analyze whether an attorney performed deficiently if the alleged deficiency did not prejudice the movant."[79]

### 1. The Plea Claim Fails.

Mr. Owens first alleges that Trial Counsel never informed him of any plea offers. This allegation is not substantiated by the record. To the contrary, the record shows that Mr. Owens received, but rejected, every plea offer.

---

[73] *See Taylor v. State*, 213 A.3d 560, 567–68 (Del. 2019); *Cooke v. State*, 977 A.2d 803, 841–42 (Del. 2009).
[74] *Cabrera v. State*, 173 A.3d 1012, 1021 (Del. 2017).
[75] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).
[76] *Green*, 238 A.3d at 174 (internal quotation marks omitted).
[77] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).
[78] *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014) (internal quotation marks omitted); *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996) ("[F]or a claim of ineffective assistance of counsel to prevail, the defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.").
[79] *Ruffin v. State*, 2019 WL 719038, at *2 (Del. Feb. 19, 2019).

The right to effective assistance of counsel extends to plea negotiations.[80] "Trial counsel in a criminal case must discuss with his client the possibility of a plea instead of going to trial, especially if the State has offered to resolve the case for a sentence significantly shorter than the defendant could face if convicted . . . ."[81] Indeed, prejudice is presumed "'if loss of the plea . . . led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence.'"[82]

After the State offered 15 years, Trial Counsel met with Mr. Owens to discuss the offer and whether the defense should accept it or move to suppress.[83] Trial Counsel moved to suppress the handgun, and regardless of its dubious merits, filing the motion did induce the prosecutor to trim 5 years off his sentencing offer, provided, however, the defense withdrew the motion. Trial Counsel met with Mr. Owens again to evaluate the hearing's merits.[84] Given that Trial Counsel ultimately argued a motion that had little support in either the law or the facts, it is reasonable to conclude that Trial Counsel underscored the advantages of taking the 10-year plea during his meeting with Mr. Owens, but that Mr. Owens insisted on the hearing nevertheless. Conversely, there is no reason to believe Trial Counsel would

---

[80] *E.g.*, *Reed*, 258 A.3d at 821–22.

[81] *Urquhart v. State*, 203 A.3d 719, 733 (Del. 2019).

[82] *Id.* at 734 (quoting *Lafler v. Cooper*, 566 U.S. 156, 168 (2012)). *See also United States v. Cronic*, 466 U.S. 648, 661–62 (1984).

[83] A133 (Flockerzie Aff.).

[84] A135–37 (Flockerzie Aff.).

deliberately withhold from Mr. Owens the fact that the plea offer had gotten sweeter with the filing of the motion but the only way to get the deal was to withdraw the motion.

This course is not only the logical one, but it is essentially what Trial Counsel represented to the Court at final case review. There is no obvious reason why Trial Counsel would tell the Court about a 10-year offer in the courtroom but not tell Mr. Owens the same thing downstairs in the lockup. Indeed, Mr. Owens offers none.

The record supports a finding that Trial Counsel conveyed every offer to Mr. Owens, "as [he was] required to do."[85] The same record depicts a defendant prepared to take ill-considered risks to avoid jail. This is the problem with risk: if it goes badly, the consequences can be severe. Mr. Owens cannot now shift the responsibility for taking those risks to Trial Counsel when they were never Trial Counsel's risks in the first place.[86]

The plea offers were better than the 19 years Mr. Owens received and the lifelong imprisonment to which he was exposed. And it is understandable that Mr. Owens preferred no jail sentence at all. But the odds of walking away without sanction were never very good. The regret he surely feels now is not a basis for post-conviction relief. Accordingly, the Plea Claim fails.

---

[85] A142 (E-mail from Ross Flockerzie, Assistant Pub. Def., Off. of Def. Servs., to David Holloway, Deputy Att'y Gen., Del. Dep't of J. (Dec. 4, 2014)).
[86] *Cabrera*, 173 A.3d at 1021.

## 2. The Suppression Claims Fail.

Mr. Owens next alleges that Trial Counsel was ineffective because he did not call to the suppression hearing three witnesses who supposedly had information and "potentially photographs" tending to show the house where the police encountered Mr. Owens was not vacant.[87] The record does not compel a finding that Trial Counsel performed deficiently or prejudiced the Defendant at the suppression hearing.

To begin, Trial Counsel affirms that he considered the witnesses, but concluded their proffers about the house's condition would be irrelevant. Trial Counsel believed that the witnesses would neither support an adverse credibility determination nor overcome the law governing seizures. Based on the facts alleged and the law involved, this was a reasonable analysis.

The officer's suspicion derived not only from the condition of the house, but also from the owner's past loitering complaints. No one lived in the house, furthering the officer's belief that Mr. Owens may not belong there. Police do not need a no-loitering sign to inquire of persons sitting on residential property who, in their experience, appear uninvited.

Moreover, Mr. Owens's behavior appeared to be that of an armed individual even before the officers parked their car or spoke to him. Contextualized, Mr.

---

[87] Def.'s Am. R. 61 Mot. at 18.

Owens's shifty movements aligned with recent reports of gun play in the area—acts the officers were investigating just prior to observing Mr. Owens at the home. The witnesses would not know about these facts and so would do nothing to rebut them.

Mr. Owens's furtive movements and sudden flight were independent, dispositive grounds for denying suppression. Looking to Trial Counsel's decision at the time he made it, rather than through the lens of the adverse outcome, it cannot be said that "no reasonable lawyer"[88] would have disregarded descriptions of the house's façade.

More important, this debate about the house's aesthetics obscures a basic purpose of post-conviction relief. Post-conviction review "ensure[s] that individuals are not imprisoned" wrongly; it is not designed to fix minor "errors of fact."[89] Ineffective assistance claims, and Rule 61 more broadly, allow *habeas* courts to rectify "miscarriage[s] of justice."[90] At their highest manifestations, ineffective assistance claims, as transmitted through Rule 61, can vindicate claims of actual innocence.[91] Calibrated to screen for the wrongfully convicted, Rule 61 should not be used to launch *post hoc* strikes on issues inessential to a judgment of guilt.

---

[88] *Green*, 238 A.3d at 174 (internal quotation marks omitted).
[89] *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Ploof*, 75 A.3d at 820 (Rule 61 "does not allow defendants unlimited opportunities to relitigate their convictions.").
[90] Del. Super. Ct. Crim. R. 61(i)(5).
[91] *Id.* R. 61(d)(2)(i).

To chill relitigation of collateral issues, the ineffective assistance standard deems successful a prejudice challenge that "undermine[s] confidence in *the* outcome."[92] Generalized speculation that "an" outcome, such as a collateral fact finding, would have been different but for the error, is insufficient. Here, then, Mr. Owens needed to allege with particularity how impeaching the officer's testimony about the no-loitering sign would have resulted in suppression—not how doing so might have affected some other determination. He has not.

For the suppression court, the no-loitering sign's existence was not the central issue. The central question was whether the officers had reasonable suspicion to believe Mr. Owens possessed a concealed firearm. Subtracting the no-loitering sign, there was an adequate basis for a stop of Mr. Owens. So even if the witnesses appeared at the hearing with photographs corroborating their stories, the officer would have been impeached on a detail of relatively little value.[93] There is no suggestion from the hearing transcript or in the suppression court's written decision that the court would have suppressed the firearm if it knew the house looked less abandoned than the officer remembered.

---

[92] *Strickland*, 466 U.S. at 694 (emphasis added).

[93] *See State v. Phlipot*, 2017 WL 2266836, at *6 (Del. Super. Ct. May 24, 2017) ("A new trial will not be granted [due to ineffective assistance] if the newly discovered evidence is 'merely cumulative or impeaching.'" (quoting *Hicks v. State*, 913 A.2d 1189, 1194 (Del. 2006))); *see also Purnell*, 254 A.3d at 1098–99.

True, it is "conceivable" that, had Trial Counsel demonstrated the unreliability of the officer's no-loitering-sign testimony, the suppression court would have found the rest of the officer's testimony unreliable too. But demonstrating prejudice requires more than possibilities. Instead, it requires a "substantial" likelihood of a different result.[94] Here, although it is possible, as Mr. Owens's says, that the witnesses "*could* have assisted in his defense,"[95] it is not substantially likely that their assistance "*would* have resulted"[96] in suppression even if they were believed. Accordingly, the Suppression Claims fail.

### 3. The Critical Stage Claim Fails.

Mr. Owens, as an incarcerated defendant, was held elsewhere in the courthouse during his final case review. Because of that, he next alleges Trial Counsel was ineffective for failing to bring him to the courtroom. This Claim theorizes that final case review is a critical stage in criminal proceedings during which Mr. Owens had a fundamental right to be present. It is not and he did not.

A defendant has a right to be physically present during all "critical stages" in the proceedings:[97] "proceeding[s] in which defendants cannot be presumed to make

---

[94] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).
[95] Def.'s Am. R. 61 Mot. at 18, 22 (emphasis added).
[96] *Swan*, 248 A.3d at 859 (emphasis added) (internal quotation marks omitted).
[97] *See, e.g.*, *Rushen v. Spain*, 464 U.S. 114, 115 (1983); *cf. Jeppi v. State*, 1998 WL 984994, at *2 (Del. Nov. 12, 1998).

critical decisions without counsel's advice."[98] Criminal Rule 43 lists proceedings where the defendant's presence is mandatory.[99] That list is exhaustive.[100] But final case review did not make the cut. So Mr. Owens was not entitled to be there.

To be sure, decisional law has recognized that the defendant's right to be present is not only rule-based, but also of "constitutional dimension."[101] But final case review is not the kind of "traditional and formal confrontation"[102] the federal or Delaware Constitution imagined. Final case review is merely a docket-management tool that operates as a status conference and streamlines administrative matters before a case is set for trial.[103] In contrast to a critical stage, final case review is not ordinarily a place where "the defendant's presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."[104]

---

[98] *E.g.*, *Reed*, 253 A.3d at 821–22 (internal quotation marks omitted).

[99] Del. Super. Ct. Crim. R. 43(a).

[100] *See, e.g.*, *Smolka v. State*, 147 A.3d 226, 229 (Del. 2015) (holding that, because suppression hearing is not listed in Rule 43, the defendant's attendance there is not required); *accord State v. Kolaco*, 2020 WL 7334176, at *6 (Del. Super. Ct. Dec. 14, 2020); *see also Walls v. State*, 850 A.2d 287, 290 (Del. 2004) ("[A]lthough a defendant has a right to be present at every stage of trial, that right is not absolute." (citations omitted)).

[101] *See, e.g.*, *Bradshaw v. State*, 806 A.2d 131, 134 (Del. 2002).

[102] *Capano v. State*, 781 A.2d 556, 654 (Del. 2001) (internal quotation marks omitted).

[103] *See Washington v. State*, 844 A.2d 293, 295–96 (Del. 2004); *see also* Del. Super. Ct. Crim. R. 43(c) (excepting from the presence requirement certain "conferences").

[104] *Bradshaw*, 806 A.2d at 134 (alteration and internal quotation marks omitted).

Of course, final case review was created by the Court to facilitate pleas and implement the rules governing them.[105]  And when the parties use final case review as a forum for formally accepting or rejecting a plea, the defendant's presence for a colloquy is required.[106]  But that is not what the parties did here.  Mr. Owens's final case review was not scheduled to formally reject a plea.  As observed already: by the time Mr. Owens's final case review occurred, the 10-year deal was off the table.

Because final case review is not a critical stage, Mr. Owens must show that his absence prejudiced him.[107]  He cannot.  Rather, Trial Counsel simply relayed that the parties had a pending suppression motion which, if resolved unfavorably, would result in trial.  Nothing about Mr. Owens's presence would have made this update more illuminating or important.  Accordingly, the Critical Stage Claim fails.

### 4.  The Allocution Claim Fails.[108]

---

[105] *See, e.g.*, *Washington*, 844 A.2d at 296 (citing Del. Super. Ct. Crim. R. 11(e)(5)).
[106] *See, e.g.*, Del. Super. Ct. Crim. R. 43(a).
[107] *See Capano*, 781 A.2d at 653–54; *see also Dutton v. State*, 452 A.2d 127, 147–48 (Del. 1982) (distinguishing instances in which defendant's absence is a *per se* reversible error from those where absence is reversible error only if prejudicial).
[108] Reasonable jurists could find this claim procedurally barred under Rule 61(i)(3). Although the allegations are framed in ineffective assistance language, any prejudice here would be caused by the *court's* allocution error.  Any error could be blamed on counsel, depending on one's level of abstraction.  But Rule 61's procedural bars would have no teeth if a post-conviction defendant could avoid them by simply recasting defaulted or precluded challenges in the language of ineffectiveness. *See State v. Barksdale*, 2020 WL 2096148, at *4 (Del. Super. Ct. Apr. 30, 2020). That said, the Court has decided to review this Claim for completeness.

As a fourth ground for relief, Mr. Owens alleges Trial Counsel was ineffective because Mr. Owens was sentenced without a chance to allocute. This allegation is contradicted by the record. Mr. Owens *was* given an opportunity to allocute, but he missed it.

Defendants have a right to allocution.[109] Allocution rights are enshrined in Rule 32, which requires the sentencing judge to address the defendant "personally" to determine whether he wants to make a statement.[110] Although doing so by direct address is preferable,[111] a sentencing judge can meet this requirement by posing an "open question" at the end of the defense's presentation.[112] For example, the Supreme Court has approved the use of "Anything else?" for satisfying Rule 32.[113]

That is what the sentencing court said. When Trial Counsel concluded his presentation, the sentencing court asked, "Anything else?"[114] At that point, Mr. Owens could have exercised his right to speak. He did not. That was so even though he later would inform the court about his education.[115] Contrasting his initial silence with his post-mitigation willingness to respond, the Court infers that Mr. Owens

---

[109] *E.g.*, *Shelton v. State*, 744 A.2d 465, 495–96 (Del. 2000).

[110] Del. Super. Ct. Crim. R. 32(a)(1)(C).

[111] *See Parker v. State*, 2016 WL 690496, at *3 (Del. Feb. 18, 2016) (describing sentencing court's failure to follow R. 32 procedures strictly as "unfortunate" but not reversing alternative method of introducing allocution testimony).

[112] *See Anderson v. State*, 2016 WL 618840, at *5 (Del. Feb. 15, 2016).

[113] *Id.* (internal quotation marks omitted).

[114] A76 (Sentencing Hr'g Tr. at 12:9).

[115] A77 (Sentencing Hr'g Tr. at 15:21–23, 16:1–2).

30

agreed to speak about mitigation matters only through Trial Counsel.[116] Because the court afforded Mr. Owens a chance to allocute, he cannot show prejudice.[117]

To the extent Mr. Owens argues Trial Counsel's poor advice led to his silence, his Claim still fails. The defense avoided allocution out of fear that Mr. Owens may inculpate himself or otherwise damage the B case.[118] Indeed, the CCDW charge was premised on the same evidence that convicted Mr. Owens in the A case. Commenting on the events of the A case could have surfaced a statement against Mr. Owens's interest potentially admissible against him in the B case.[119] Given the amount of prison time Mr. Owens already faced, Trial Counsel's decision to advise against allocution was a reasonable strategy designed to preserve defenses in the B case.[120] Accordingly, the Allocution Claim fails.

### 5. The Neglect Claims Fail.

---

[116] *Id.*

[117] *Id.* ("Anderson had the opportunity to speak on his own behalf and chose to speak through counsel. It is not apparent on the face of this record that Anderson was deprived of a substantial right . . . .").

[118] Inevitably, had Mr. Owens ignored Trial Counsel's non-allocution strategy and botched his remarks, he would have claimed any bad result in the B case was caused by ineffective assistance. *Cf. Harden v. State*, 180 A.3d 1037, 1045–49 (Del. 2018).

[119] *See* Del. R. Evid. 804(a)(1), (b)(3). *E.g., Demby v. State*, 695 A.2d 1152, 1158 (Del. 1997) (observing that invocation of Fifth Amendment makes declarant-defendant "unavailable" for purposes of Rule 804 hearsay exceptions).

[120] *See Parker*, 2016 WL 690496, at *3 ("[A]ny failure of a trial court to adhere to the right of allocution is an error [that] is neither jurisdictional nor constitutional and not a fundamental defect [that] inherently results in a complete miscarriage of justice so as to constitute a denial of a fair trial." (alterations and internal quotation marks omitted)).

As a fifth basis for post-conviction relief, Mr. Owens alleges that Trial Counsel was ineffective because Trial Counsel did not meet with him at all or at least often enough to prepare him for any defense of the A case. The Court tacitly resolved these Claims in the context of the Plea and Suppression Claims and so here rejects them as it did before. The only remaining allegation is that Trial Counsel was ineffective for failing to write a mitigation report. This allegation fails too.

Preliminarily, this allegation seems to assert an excessiveness challenge to the length of Mr. Owens's sentence. To the extent that it does, however, the Court cannot review it. Rule 61 applies to convictions, not sentences.[121] As a result, "sentencing claims are not cognizable under Rule 61."[122] Regardless, Mr. Owens's sentence is long, but not illegal. As a habitual offender, Mr. Owens could have been sentenced to life imprisonment. Nineteen years is well-within statutory limits.[123]

For a similar reason, Mr. Owens also cannot show he was prejudiced for lack of a mitigation report. On these facts, a habitual PFBPP conviction carried a 15-year minimum mandatory sentence. Trial Counsel could not have reduced that total. Neither would a mitigation report.

---

[121] *See* Del. Super. Ct. Crim. R. 61(a)(1); *cf. id.* (providing exception for capital sentences).

[122] *Gilmore v. State*, 2016 WL 936990, at *1 (Del. Mar. 10, 2016). *See Wilson v. State*, 2006 WL 1291369, at *2 (Del. May 9, 2006); *cf.* Del. Super. Ct. Crim. R. 35.

[123] *See, e.g., Brittingham v. State*, 705 A.2d 577, 578 (Del. 1998) (holding that correction of a sentence is available, among other situations, "when the sentence imposed exceeds statutorily authorized limits" (internal quotation marks omitted)).

Turning to the additional four years, Mr. Owens does not allege with particularity how Trial Counsel's "mitigation report"—or whatever it might discuss—would have persuaded the court not to impose more than 15 years. The court went beyond the minimum mandatory because the weapon was concealed and Mr. Owens has an extensive criminal history.[124] Trial Counsel's arguments on those issues were rejected.[125] So it is not reasonably likely that complimentary data would have made a difference. Accordingly, all the Neglect Claims fail.[126]

### 6. The Cumulative Error Claim Fails.

Finally, Mr. Owens attempts to package all his prior unavailing claims into one, wholistic claim of "cumulative error." The cumulative error or effect doctrine applies when each error, "standing alone, would not be the basis for reversal."[127]

---

[124] A77 (Sentencing Hr'g Tr. 13:19–23, 14:1–23); A81 (Sentencing Or.).

[125] *See, e.g.*, A77 (Sentencing Hr'g Tr. 14:10–11) ("The Court: He hasn't hurt anybody seriously yet, but that's where this is heading.").

[126] The Court would be remiss if it did not remind Mr. Owens that this Court retained jurisdiction, "after several years have passed," to modify or eliminate the additional four years that were imposed. A81 (Sentencing Or.). When sentencing jurisdiction is retained, the time limits that ordinarily bar untimely sentence-reduction motions become inoperative. *See* Del. Super. Ct. Crim. R. 35(b) (citing 11 *Del. C.* § 4217). Mr. Owens, however, should not understand this note as a sign of guaranteed success or as an invitation to file. Indicia of rehabilitation, including positive interactions with the Department of Corrections, are required, and failure to make a motion at the right time could result in any subsequent motions being denied as repetitive. *Id.*

[127] *Drumgo v. State*, 2012 WL 1377596, at *1 (Del. Apr. 17, 2012).

33

Logically, a cumulative error analysis presupposes that errors exist.[128] But the Court sees no errors here. So there is nothing to accumulate.[129] Accordingly, the Cumulative Error Claim fails.

**C. An Evidentiary Hearing is Unwarranted.**

Mr. Owens has requested an evidentiary hearing. Notably, he has never maintained his innocence. He does not allege that he was not at the house, that he did not run from the police, or that the gun recovered on the sidewalk belonged to someone else. Instead, he wants to testify from personal knowledge about how his lawyer did not communicate a plea and to produce the suppression witnesses he believes Trial Counsel should have called. Given those plans, and the foregoing analysis, the Court must determine whether an evidentiary hearing is "desirable."[130] The Court concludes it is not.

---

[128] *See, e.g.*, *Starling v. State*, 130 A.3d 316, 336 (Del. 2015) ("Where there are *multiple errors* in a trial, the Court must weigh their cumulative effect . . . ." (emphasis added)).

[129] *E.g.*, *Hoskins*, 102 A.3d at 735 ("As we have already noted, none of Hoskins'[s] individual claims of ineffective assistance have merit because of a failure to show prejudice. Hoskins'[s] claim of cumulative error is without merit.").

[130] Del. Super. Ct. Crim. R. 61(h)(1).

There is no right to a post-conviction evidentiary hearing.[131]  And not every case warrants one.[132]  Taken together, the Court has "broad discretion" to deny a request for an evidentiary hearing where conducting one would not resolve open, but decisive, questions left unanswered by the original proceedings.[133]

An evidentiary hearing is not empty ritual.  It can aid in reversing a wrongful conviction by advancing the defendant's claims with greater precision and toward a fuller understanding.  Stated negatively, an evidentiary hearing is not an opportunity to present unsupported allegations that are contradicted by the pre-hearing record or to address secondary issues that are not material to a favorable determination of the defendant's claims.[134]  So a defendant seeking a hearing must propose more than

_____

[131] *E.g.*, *Getz v. State*, 2013 WL 5656208, at *1 (Del. Oct. 15, 2013) ("Rule 61 does not mandate the scheduling of an evidentiary hearing in every case, but, rather, leaves it to the Superior Court to determine whether [one] is needed.").

[132] *See Hawkins v. State*, 2003 WL 22957025, at *1 (Del. Dec. 10, 2003) ("It is well-settled that the Superior Court is not required to conduct an evidentiary hearing upon a Rule 61 motion if, on the face of the motion, it appears that the petitioner is not entitled to relief.").

[133] *Winn v. State*, 2015 WL 1469116, at *2 (Mar. 30, 2015).

[134] *E.g.*, *State v. Melendez*, 2003 WL 23095688, at *8 (Del. Super. Ct. Dec. 19, 2003) ("Melendez's claims might warrant an evidentiary hearing if [the record] did not wholly contradict the allegations in his Rule 61 motion."), *aff'd*, 2004 WL 1965650 (Del. Aug. 25, 2004); *accord State v. Brown*, 2004 WL 2240161, at *2 (Del. Super. Ct. Sept. 17, 2004).  *See also State v. Guess*, 2014 WL 3510017, at *3 (Del. Super. Ct. July 15, 2014) (denying evidentiary hearing where "affidavit, transcript, and the [criminal] file" contradicted post-conviction defendant's allegations); *State v. Jones*, 2008 WL 4173816, at *23 (Del. Super. Ct. Sept. 3, 2008) (denying evidentiary hearing because the Court "analyzed every single claim" and "none" was supported by the record); *State v. Bradley*, 2006 WL 3308207, at *1 (Del. Super. Ct. Oct. 17, 2006) (rejecting without evidentiary hearing plea challenge because defendant's

bare allegations refuted by the record or collateral evidence that would not change the outcome.[135]

Here, Mr. Owens's proffered presentation is unsubstantiated and, if entertained, would defeat the purpose of an evidentiary hearing. As explained, the record refutes Mr. Owens's allegation that Trial Counsel never told him about a plea. At a hearing, Mr. Owens would simply repeat his allegations in a courtroom. He has not marshaled reliable documents or a credible witness or identified another "sufficient factual and legal basis"[136] for impugning Trial Counsel's testimony that he communicated the plea offers. As a practical matter, then, the Court would be required to resolve a credibility battle by choosing between an *ipse dixit* narrative emerging for the first time in an amended Rule 61 motion and an affidavit supported by a record that contradicts the defendant's claims. That not really being a choice, an evidentiary hearing would be futile and not be "what justice dictates."[137]

---

claims were "not credible" and contradicted by record evidence); *State v. Barham*, 2002 WL 1584901, at *2 (Del. Super. Ct. July 3, 2002) (rejecting without evidentiary hearing Rule 61 challenge to plea because defendant's claims were "not credible" and "had no bearing on [his] decision to enter a guilty plea").

[135] *See Melendez*, 2003 WL 23095688, at *8 ("In a situation in which a defendant submits specific factual allegations not directly contradicted in the record . . ., further fact development would be required."); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

[136] Del. Super. Ct. Crim. R. 61(a)(1).

[137] *Id.* R. 61(h)(3).

As to the suppression witnesses, the Court already explained that their impeachment testimony, even if correct and believed (and not impeached in its own right), would not undermine the Court's confidence in the suppression ruling. Impeachment evidence that "goes only to the weight and credibility" of an adverse witness, like the officer, does not justify a new trial.[138]

More important, even if the witnesses produced photographs showing the home occupied and without a no-loitering sign, it would not make a difference. To reiterate: the police knew the owner had reported loitering on the property in the past. Stopping to inquire of Mr. Owens would have been appropriate regardless of the condition of the property. Mr. Owens's decision to run in a high-crime area obviously came before (and supported) the police telling him to stop and further supported their suspicions he was up to no good.[139] Any doubts about the police suspicions were allayed by Mr. Owens's own conduct. At best, therefore, the witnesses' testimony would clarify a fact collateral to whether the police could detain Mr. Owens on a reasonable suspicion that he possessed a firearm. Because the existing record and the one Mr. Owens aspires to create show the suppression ruling "would [not] have been different"[140] had Trial Counsel called the witnesses, an evidentiary hearing is unwarranted and so is denied.

---

[138] *Purnell*, 254 A.3d at 1098 (emphasis omitted).
[139] *E.g.*, *Woody v. State*, 765 A.2d 1257, 1265–66 (Del. 2001).
[140] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).

**CONCLUSION**

For the foregoing reasons, Mr. Owens's Rule 61 motion is **DENIED**.

**IT IS SO ORDERED**.

Charles E. Butler, Resident Judge